NELL McCANN, INDIVIDUALLY AND T/A NELL McCANN
REALTY, PLAINTIFF-APPELLANT, v. STEVEN BISS
AND JOAN BISS, DEFENDANTS-RESPONDENTS, AND
ERNEST E. WUESTER AND ELAINE P. WUESTER, DE-
FENDANTS-RESPONDENTS.

Argued December 19, 1973—Decided June 25, 1974.

*Mr. Terence P. Corcoran* argued the cause for plaintiff-appellant (*Messrs. Corrado, Corcoran & Sokalski,* attorneys; *Mr. Corcoran,* of counsel and on the brief).

*Mr. William C. Bochet* argued the cause for defendants-respondents Biss (*Messrs. Dobrin, Muscarella & Saunders,* attorneys; *Mr. Bochet,* of counsel and on the brief).

*Mr. George van Hartogh* argued the cause for defendants-respondents Wuester (*Messrs. Slingland, Bernstein & van Hartogh,* attorneys; *Mr. van Hartogh,* of counsel and on the brief).

The opinion of the Court was delivered by

HALL, J. In this suit in the Bergen County District Court the plaintiff, a real estate broker, sought to recover commissions on the sale of a residential property in West Milford, Passaic County, made directly by defendants Biss (sellers) to defendants Wuester (buyers). The broker did not have written authority from the sellers to sell the property nor did she serve upon them a so-called "five day notice" at any time after the alleged making of an oral agreement with them, as required by the special statute of frauds applicable to real estate commission agreements. *N. J. S. A.* 25:1–9.

 Liability was attempted to be predicated upon various alternative contract and tort theories. Counts in the complaint against the sellers based on express contract and *quantum meruit* were properly dismissed on motion prior to trial by reason of the statute of frauds and no appeal was taken therefrom. A third count against the buyers claiming that, having solicited plaintiff's services to find a residence for them, they thereby "entered into an implied promise with the plaintiff" to complete the transaction through her "so that the plaintiff could earn her just commission from the sellers," was dismissed at the end of plaintiff's case. The fourth count, against both buyers and sellers, alleged that both "intentionally undertook acts, the results of which were to unjustifiably interfere with the plaintiff's lawful business opportunity to earn a commission for bringing the parties together," or, to phrase it as the trial court did, a claim that the parties, or either of them, wrongfully interfered with a reasonable expectancy of economic advantage or benefit on the part of the broker (a cause of action available in appropriate real estate brokerage matters since *Louis Kamm, Inc. v. Flink,* 113 *N. J. L.* 582 (E. & A. 1934)). This claim was left to the jury,[1] which returned a verdict in the ap-

---

[1]Although the matter has never been raised by the defendants, we may say that the charge to the jury was hardly adequate to enable that body to properly consider and reach a decision on the tortious

proximate amount of six per cent of the selling price only against the sellers, at the same time finding in favor of the buyers.

■■ The sellers appealed the judgment against them and plaintiff cross-appealed from the dismissal of the implied contract claim against the buyers. Plaintiff took no appeal from the judgment resulting from the jury verdict for the buyers on the tortious interference count. The Appellate Division, in an unreported opinion, sustained the dismissal of the implied contract count and reversed the judgment against the sellers based on the tortious interference theory, holding that the sellers' motion for judgment[2] should have been granted. The cause was remanded to the trial court for the entry of final judgment in favor of the sellers. We granted the broker's petition for certification. 63 *N. J.* 582 (1973).

As the case thus comes to us, only two questions arise, both of which are legal and novel. First, whether a broker, who cannot recover a commission from a seller on a contract theory because of the statute of frauds, may avoid the statute and do so on the theory of tortious interference. Second, whether a buyer may be required to pay the commission on some theory of implied contract with the broker when the latter cannot recover from the seller.

---

interference claim. While the basic legal elements of that rather difficult tort were abstractly recited in terms of wrongful and unjustifiable interference, those characterizations were not defined nor was there any attempt to relate the evidence to the necessary elements —something which should be done in every case so that the jury may intelligently and correctly apply the law to the facts as it finds them.

[2]It is almost impossible to determine in this case what motions were made during the course of trial, the basis thereof or the reasons for their disposition. We understand that while the motions and argument thereon were recorded by the stenographer, the filed transcript omitted the same by stipulation of the parties. *R.* 2:5–3(c)(1). This should not be done when, as here, such motion is important because of the issues raised on appeal. In addition, the trial judge decided the motions by stating a summary conclusion without reasons. Judges should always state their reasons so that counsel and an appellate tribunal may be fully informed.

The factual framework in which these questions arise is rather typical. As in so many commission cases where there is no writing employing the broker, the evidence was highly contradictory. The interested parties were the only witnesses, in many aspects their testimony was sparse and confusing, there was very little that could be said to be corroborative and it is exceedingly difficult to determine the full truth. We need not detail all the evidence; some salient features will suffice to sketch the picture. In early May 1971 the buyers came to plaintiff's office and told her saleslady they were interested in buying a home and solicited plaintiff's services in finding a suitable property. Their requirements were somewhat special; they needed a sizeable plot with considerable privacy in order to raise dogs without annoying neighbors. Plaintiff testified that she did not expect the buyers to pay anything for her services to them and that they were not told they would have to pay a commission; indeed, nothing was ever demanded from them until this suit was started.

In the latter part of May and early June the sellers advertised their home for sale in various area newspapers. As is so frequently the case, they were swarmed over by prospective buyers who wished to inspect the property and by brokers who sought authority to sell it. Some prospects came with brokers. There were so many they could not differentiate between them and they generally did not ask who the visitors were. The situation was probably made more confusing by the fact that Mrs. Biss worked day times seven days a week and Mr. Biss worked nights, so that they were infrequently both at home when callers arrived. It seems clear they wished to sell the property themselves and did not desire the services of a broker. Their testimony was that they did not authorize any broker to act for them. At most, it would seem they would sell to a buyer produced by a broker only if the offered price, exclusive of commission, met their figure. That figure was an asking amount of $37,500 and a bottom price of $36,900. This is borne out by the

$36,900 price at which these buyers ultimately purchased the property.

On the other hand, plaintiff's saleslady testified that she saw the sellers' advertisement on May 28, telephoned Mr. Biss and solicited authority to sell. She said he refused to enter into an "exclusive listing agreement," but did agree to an "open listing." (Mr. Biss denied this completely.) While the full nature of such an arrangement was not defined in the evidence, we gather it is prevalent in the real estate business and amounts to no more than an oral permission, not confirmed in any way, to the broker to seek and produce an acceptable buyer. Both plaintiff and her saleslady admitted they knew it was not an enforceable contract and that a "five-day notice" served on the sellers was necessary to make it so.

Plaintiff's saleslady went on to say that the day after the telephone conversation, she inspected the premises with Mr. Biss and obtained detailed information for the listing card, which she then prepared. The price set forth on the card was $37,500, with a code notation that the sellers must receive $35,000 net. The accuracy of these notations is somewhat doubtful in view of the sellers' testimony as to the asking and bottom prices and the actual selling price. If the price conversation were held with the saleslady, which Mr. Biss denied, there might well have been misunderstanding in his mind between net price and price subject to commission. The broker did not advertise the property or place her sign upon it. Admittedly, the broker did not communicate to the Wuesters the fact or details of any agency agreement with the sellers. The saleslady said she took Mrs. Wuester to see the Biss property and another house on June 3. This visit was confirmed by Mrs. Wuester but she did not fix the date precisely. The Bisses could not testify positively about it by reason of the confusion resulting from so many persons coming, with brokers or alone, to look at the house.

The saleslady further testified that she had another appointment with Mr. and Mrs. Wuester on June 9 to again visit the house. When they arrived at the office, they had already been to the property. She then called Mr. Biss and made an offer of $37,000 on behalf of the Wuesters. (Mr. Biss denied the receipt of any such offer and the Wuesters did not confirm either the making of it to the saleslady or the telephone call of transmission.) Mr. Biss is said to have responded that he wanted $37,500, that he would not come down and that the broker should cut the commission, which latter suggestion was refused. (Again, if the conversation actually took place, Mr. Biss may have been confused between gross and net selling price.) There is no testimony of any effort by the saleslady at that time to negotiate further. Any such attempts would very likely have been futile in view of Mr. Biss' attitude. Indeed, the broker actually did nothing more along this line. On June 29 the saleslady did call both parties. Mr. Biss told her truthfully that the house had been sold, but did not give the identity of the buyers. There was no testimony that he was asked that question. Mrs. Wuester falsely said that they had decided to rent and not to buy.

Sometime during this period — the testimony is too confusing to pinpoint the date — the Bisses and the Wuesters got together and agreed on a sale price of $36,900 after Mr. Biss had said, according to the Wuesters, that he would not deal through a broker. A formal contract of sale was prepared by the then attorney for the Bisses, which contained the frequently used clause that "The Purchasers herein represent to the Sellers that no broker brought about the sale of this property." The contract was executed on June 19, with the Wuesters being unrepresented by counsel. They made no comment about the quoted clause and there is no testimony that they understood its meaning and import. Title was closed sometime thereafter.

It will be noted — and is to be emphasized — that this is not the usual case where a seller and buyer deal directly,

despite the presence of a broker in the situation, and agree on a price which represents the seller's figure less commission. Here the sellers received the lowest net figure they were willing to accept and the buyers paid the highest price they would agree to and gained no pecuniary advantage from the exclusion of the broker. It seems apparent there would have been no deal otherwise.

Turning to the first issue presented — whether a broker, who is barred from recovering commissions from a seller by reason of the statute of. frauds, may avoid the statute and do so on a tortious interference theory[3] —, we may first comment that what happened in this case well illustrates a sound reason for the statutory requirement of written authority to a broker. It may be assumed that the oral "open listing" method is used because the broker expects, if he produces the ultimate buyer, that the seller will agree to pay the commission by the inclusion of a clause to that effect in the contract of sale (which is sufficient to satisfy the statute of frauds) or at least hopes that it will be voluntarily paid even though there is no legal obligation to do so, and wishes to avoid the possibility of the refusal of an owner to sign at the outset a document of authority the full import of which the latter may not be sure. The method is open to much misunderstanding, as well as outright fraud, and is productive of a vast amount of litigation which would be avoided if brokers would take only listings confirmed by the signature of the seller in all aspects, including price and commission obligation (as specified in *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N. J.* 528 (1967)). To do less involves, as it did here, a calculated risk on the part of a broker.

---

[3]This is the theory upon which the case went to the jury. It will be recalled that the jury found in favor of the buyers and no appeal was taken by the broker therefrom, so we are not concerned with whether the conduct of the buyers amounted to wrongful interference with the broker's reasonable expectancy of economic advantage sufficient to ground a verdict against them.

The special real estate broker commission statute of frauds has been on our statute books since 1873. *L.* 1873, *c.* 215, p. 50. It has been amended only twice since enactment, *L.* 1911, *c.* 331, *L.* 1918, *c.* 273, both times to the advantage of brokers. It remains today, *N. J. S. A.* 25:1–9, a most positive declaration: "No broker * * * selling * * * real estate for or on account of the owner shall be entitled to *any* commission for such sale * * *" unless his authority is in writing or recognized in a writing, signed by the owner or his authorized agent, before or after the sale, which states therein the rate or amount of commission or unless the broker serves a notice in writing on the owner within five days of the making of an oral agreement setting forth the terms thereof. (Emphasis supplied). The statute represents a strong statement of public policy by the Legislature which cannot be ignored. It has long been so viewed. See *Stout v. Humphrey,* 69 *N. J. L.* 436 (E. & A. 1903); *Leimbach v. Regner,* 70 *N. J. L.* 608 (Sup. Ct. 1904); *Sadler v. Young,* 78 *N. J. L.* 594 (E. & A. 1910). *Leimbach* held, for example, that a suit to recover for broker's services rendered pursuant to an oral agreement by casting the action as a claim in *quantum meruit* was an attempt to evade the statute which would not be countenanced.

This view accords with the general law on the subject aptly stated in 2 *Restatement, Agency* 2d § 468 at 398 (1958), entitled "Statute of Frauds as Defense":

\* \* \* \* \* \* \* \*

(2) If a statute provides that a person employing another for a specified purpose shall not be liable to the other for compensation although the other renders the promised performance, unless the employer has signed a memorandum in writing, a person has no duty to pay to another whom he orally employs for such purpose either the promised compensation or the reasonable value of services rendered.

Comment (b) thereon (at 399) is particularly pertinent:

b. Statutes similar to the one referred to in this Subsection are not infrequently enacted with reference to contracts with real estate brokers. The memorandum commonly required under such statutes is

one which describes the thing to be sold and the terms of compensation. In the absence of such a memorandum, the employer, although benefited by the service of the agent who has been orally employed by him, is under no duty to give compensation *in any form.* * * *

The rule stated in this Subsection differs radically from that applying to the ordinary Statutes of Frauds. Its purpose is to protect against fraudulent claims for services; if the broker were entitled to obtain the value of services the statute would not have the effect intended. *Brokers are professionals; it is not unfair to deprive them of compensation if they do not adopt the safeguards of which they should be aware.* (Emphasis supplied).

█ We are of the opinion that, as a general proposition, a broker, who may not recover commissions from a seller directly by reason of the statute of frauds, may not accomplish the same result indirectly by a claim against the seller for wrongful interference with the broker's reasonable expectancy of economic benefit. That expected benefit has to be the payment of commission by the seller, but the basis thereof is in turn the oral agreement between broker and seller which is void and unenforceable by reason of the statute. Such a claim actually seeks to enforce the oral agreement, amounts to an effort to evade the statute, and like a claim in *quantum meruit,* would substantially undercut the law and its spirit. It cannot be allowed. We believe this conclusion is dictated and was foreshadowed by this court's opinion in *C. B. Snyder Realty Co. v. National Newark & Essex Banking Co.,* 14 *N. J.* 146 (1953). Although there the factual situation and the claims were infinitely more complex, we said esssentially, 14 *N. J.* at 164–165, what we have just spelled out here.

We are not unmindful that certain of our cases have sanctioned causes of action by broker against seller on various tort theories. We view these decisions not as in denigration of the general rule announced above, but rather as dealing with peculiar factual and legal situations falling outside of it. They are not apposite to the case at bar. In *Louis Schlesinger Co. v. Rice,* 4 *N. J.* 169 (1950), involving a written agreement of exclusive agency for the leasing of premises, it was said that the owner could be held liable for damages for appointing another broker to lease the prpoerty during the

contract term. Summary judgment in the owner's favor was reversed. *Louis Schlesinger Co. v. Wilson,* 22 *N. J.* 576 (1956), involved a broker's suit against an owner who admittedly had entered into an oral agreement with the broker. The latter produced a ready, willing and able buyer, but the sale could not be consummated because the owner had, prior to the agreement, given an option to buy to a third party, had failed to disclose that fact to the broker, and indeed had misrepresented to the broker that it was within his power to consummate a sale to the purchaser produced. It was held that the seller's fraud was not sufficient to overcome the bar of the statute of frauds as to the broker's contract claim, but that the owner could be liable in deceit. The dismissal of a count therefor was reversed and the matter remanded for further proceedings thereon. In *Sustick v. Slatina,* 48 *N. J. Super.* 134 (App. Div. 1957), a broker's verdict against both seller and buyer on the theory of tortious interference with the contractual relationship between broker and seller was sustained on appeal. The contract was oral but the seller did not assert the defense of the statute of frauds. After the broker had introduced the buyer to the seller, these parties dealt directly and arrived at a lower price for the property by excluding the commission therefrom. *Brenner & Co. v. Perl,* 72 *N. J. Super.* 160 (App. Div. 1962), concerned a situation where the seller had entered into a written agreement with the broker for a specified period of time. The broker sued in contract and tort. The seller had sold directly to the buyer after the agreement had expired. Summary judgment was granted the seller on both counts. That action was sustained as to the contract theory because of the expiration of the agreement, but was reversed and remanded for trial as to the tort theory on the basis of a permissible inference, raising a question of fact, that the seller had induced the buyer, who had first been shown the property by the broker during the contract period, to withhold the offer to purchase until after the agency agreement had ended.

The result in the instant case therefore is that, viewing the evidence in the light most favorable to the broker, the sellers were legally justified, by reason of the statute of frauds, in refusing to recognize any oral agreement and cannot be held liable for commission on a tortious interference theory. Their motion for judgment should have been granted, as the Appellate Division held.

The broker's implied contract theory of recovery against the buyers is patently frivolous. That theory projects, as we have earlier indicated, that, when a buyer solicits a broker's services in finding a suitable property, the buyer impliedly contracts with the broker that, if the latter produces a property which the buyer agrees to purchase, he will complete the transaction through the broker so that the latter will receive his commission from the seller, and that, if the buyer does not do so, he will be liable for the commission. (As previously stated, the count of the complaint embodying this theory was dismissed by the trial court at the end of the plaintiff's case. It had, however, been sustained by another judge in denying the buyers' pretrial motion for summary judgment.)

The theory and cause of action is asserted to be sanctioned in this court's decision in *Ellsworth Dobbs, Inc. v. Johnson, supra* (50 *N. J.* at 558–562). The situation in that case was, however, vastly different. There a valid brokerage agreement existed between the broker and the seller and the buyer, produced by the broker, entered into a contract of sale. The buyer defaulted and the sale was not completed, so that the broker received no commission from the seller. We held that, under such circumstances, the buyer had become subject to an implied obligation to the broker to complete the purchase and, upon his wrongful default in completion, became liable to pay the commission which the broker was deprived of from the seller.

In the instant case, while the sale was completed by the buyers, that is not the decisive factor here. Rather it is plain that the broker's theory would extend *Dobbs* completely

beyond its rationale. That case does not support the proposition here urged and we know of no other authority which does. What the broker here is really contending is a totally different kind of contract, implied in law, between broker and buyer, *i. e.*, that a buyer impliedly agrees with the broker that he will pay the commission if the broker cannot legally collect it from the seller. This is a grossly onerous and unfair obligation to impose upon a buyer, absent an express agreement between buyer and broker to that effect, who is, as the jury found here, innocent of any actionable wrongful conduct against the broker.[4] Here the sellers refused to deal through the broker, which we have found they were legally justified in doing because of the statute of frauds. In view of that fact, it is impossible to see how, realistically, the buyers could have completed the transaction through the broker, or, perhaps more accurately, compelled the sellers to do so, so that she could have earned her commission from the sellers, as plaintiff urges. On plaintiff's thesis, the only way the buyers could avoid the payment of the commission would have been to refuse to enter into a contract of sale and give up the purchase of the property. This would be neither good law nor good sense. We conclude that the law implies no such contract as plaintiff urges and that the Appellate Division was correct in sustaining the dismissal of the count of the complaint based thereon.[5]

---

[4]We reiterate that this is not a case like *McCue v. Deppert*, 21 *N. J. Super.* 591 (App. Div. 1952), *Sustick v. Slatina, supra* (48 *N. J. Super.* 134), or *Harris v. Perl*, 41 *N. J.* 455 (1964), where the buyers were found guilty of tortious conduct toward a broker resulting in the pecuniary advantage to them of reduction in the price corresponding to the amount of the commission.

[5]The broker further argues on appeal that tortious conduct of the sellers, actionable against them, should be found in their inducing the buyers to breach the latter's implied contract with the broker which they posit. Since we have held there is no such contract, any theory of tort action against the sellers based thereon collapses with it.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD and Judge COLLESTER—6.

*For reversal*—None.